Billy Don CRAIG, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–88–00156–CR.

Court of Appeals of Texas,
El Paso.

Nov. 22, 1989.

Rehearing Overruled Feb. 14, 1990.

Ruth Marks, Odessa, for appellant.

Gary Garrison, Dist. Atty., Odessa, for appellee.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This is an appeal from a conviction for murder. The jury assessed punishment at imprisonment for life and a fine of $10,-000.00. We affirm.

In August 1987, Lori Daughenbaugh, her first cousin, Bryan Hamilton, and her second cousin, James Kelly Branscum (the deceased) were engaged in a protracted three-day round of partying at various clubs and motels in Odessa, consuming both alcohol and cocaine. Other individuals joined and left the group over the course of the three days. One of these was the Appellant, who had been introduced to Daughenbaugh by the manager at the Bunny Club where she worked as a dancer. On approximately the fourth day, Daughenbaugh expressed the need for rest and Appellant let her use his room at the 12–Oaks Motel while he tended to some business matter. He left a large

quantity of cocaine for her to make use of while he was gone. Hamilton had come in while Appellant was still there. After Appellant left, Branscum, Ricky Howard and a Hispanic named "Willie" arrived. With the exception of Howard, the men and Daughenbaugh began using the cocaine. While not personally using it, Howard took a quantity of the cocaine to sell to someone else. The men eventually left. When Appellant returned, the cocaine was entirely gone. Appellant's moods began to shift radically, at times expressing great anger and at others appearing unconcerned. At one point, he threatened to kill Howard. He subsequently contacted Branscum, Hamilton and Howard individually. After these meetings, his moods, as observed by Daughenbaugh, continued to shift. The next day, Daughenbaugh left with Hamilton. Appellant found them in a restaurant and wanted to know where Branscum lived. He appeared angry, so they misdirected him. Daughenbaugh took her daughter to the Desert Inn Motel. Hamilton arrived to tell her that he and Branscum were leaving town. He advised her to do the same. He indicated that Branscum had reported Appellant to Crime Stoppers. Branscum came by later to repeat the warning and told her that Appellant had threatened his life. Daughenbaugh stayed with her mother for two days and then left for Fort Worth. Branscum and Hamilton left to stay in a trailer at Lake LBJ for four days. They returned to Odessa on Saturday, August 15, and received a telephone call warning them that some men were after them. Branscum loaded two guns, handed one to Hamilton and then left alone in a Chevrolet pickup truck.

Branscum was observed entering Ziggi's Bar in Odessa at approximately 11:00 p.m. that night. He was refused service due to his state of intoxication. He was seen by Appellant, Jane Jackson Williams and Billy Wayne Williams. The latter three were visiting various clubs. There was no confrontation at that time, but Appellant told the others that Branscum had "ripped him off." Later, as Appellant and his companions left another club, Branscum's female companion was observed entering a taxi alone. They saw Branscum passed out in the cab of his truck nearby. Billy Williams commented that there was no point in trying to talk to Branscum then, but if he were arrested for DWI, that would consume the money he owed Appellant. He suggested that Appellant drive him home. Appellant approached Branscum's truck and knocked on the driver's window. Branscum roused, opened the door and moved to the passenger side. Appellant then entered and drove off, followed by Jane and Billy Williams, the former driving the trail vehicle. The lead vehicle stopped briefly in a parking lot, then resumed travel. As they proceeded, Jane Williams saw Branscum's arms extended toward Appellant. She became concerned that they were fighting and yelled at Billy Williams who was preoccupied with some cocaine. The lead truck went off the road and Jane Williams saw a yellow flash inside the cab. After both vehicles stopped, Appellant exited and walked back to the other truck. He was scared, sweaty and had blood on his hands. He told them Branscum was dead. They drove to Marathon, Texas. Upon arrival, Appellant was sick. He washed and disposed of the cocaine in their possession. They stayed at Billy Williams' house for three days. Appellant continued to be ill and could not eat. Appellant and Billy Williams discussed news accounts of the killing. Appellant related that he had confronted Branscum with the theft of the cocaine and demanded money to make up for it. He did not "pull a gun" on Branscum until the brief stop in the parking lot and then only because Branscum "wasn't taking him seriously." Appellant and Billy Williams melted Appellant's gun with a "torch". The residue was disposed of along the road back to Midland. They separated upon arriving in Midland. Billy and Jane Williams returned to Odessa. The next day they reported these events to the sheriff's office.

Officer Stacey Nobles was the first to discover the body of Branscum. He observed the vehicle in the bar ditch with the lights on. Upon approaching, he found the doors locked and saw Branscum slumped

back in the corner of the passenger's side of the cab, apparently dead. His seat belt, both lap and shoulder straps, were still engaged. There was a bullet hole through the right side of the cab. A holstered pistol was found on the floorboard near his feet. Upon conducting an autopsy, Dr. Robert A. Bright found that Branscum died as the result of a gunshot wound to the left side of his neck, directly below the ear. A second bullet wound was located on the left side of his back. The doctor also detected a blunt force laceration and abrasion of the right eye, contusions and peeling of the skin on the right hand and abrasions on the left forearm, all consistent with a "fight". Dr. Bright testified that the bullets were either .38 or .357 calibre. Prior testimony from Terry Cooper indicated that Appellant was in possession of a .38 or .357 calibre revolver at the time he was looking for Branscum.

The State also presented the testimony of Greg Bonner, a Midland mechanic who had been working on Appellant's vehicle during the events described above. Appellant picked up the vehicle after separating from Jane and Billy Williams. Appellant told Bonner that he needed to drive to Fort Worth to find a lawyer because he was suspected in a shooting, and that the victim had been shot because he owed money due to a drug "rip-off".

■ Point of Error No. One challenges the court's refusal to submit a requested charge on the lesser offense of voluntary manslaughter. Under *Royster v. State*, 622 S.W.2d 442 (Tex.Crim.App.1981), there was no error in refusing to submit the instruction because the evidence did not raise the lesser offense as an alternative interpretive scenario, independent of the murder charge. There is no evidence of provocation on the part of the deceased *at the time of the offense* and no evidence that Appellant's state of mind, if shown to encompass fear at all, rose to a level of rage, resentment or terror capable of preventing cool reflection. The only evidence of provocation related to the deceased's apparent prior act of taking some of Appellant's cocaine. There is no evidence of

violence or threat of violence on the part of the deceased at the time of the shooting. See *Cerda v. State*, 557 S.W.2d 954, 958 (Tex.Crim.App.1977). Appellant points to the weapon at the deceased's feet. We note that the weapon was still holstered when the body was found. There is no evidence that the weapon was drawn or used in any threatening manner. Even if we indulged in such speculation, are we then to assume that the fatally wounded Branscum reholstered his own weapon or that the Appellant, in the throes of sudden passion, paused in his departure not only to lock the vehicle doors but also reholster his adversary's weapon? We think not. Appellant also suggests that the additional injuries to Branscum's eye, hand and forearm are evidence of a fight. If by fight he means a two-way exchange of blows, we reject the suggestion. All this evidence shows is that the deceased was the recipient of physical blows prior to his death by gunshot. There is no evidence of any infliction of injury to Appellant. The deceased was still restrained by the lap and shoulder straps of his seat belt when found by Officer Nobles. Nor does the evidence reflect the level of mental and emotional distress on the part of Appellant which would amount to sudden passion. The only evidence is that *after* the killing he was scared, sweaty and unable to eat. There is no evidence of the degree of rage, anger or resentment required under Tex.Penal Code Ann. sec. 19.04(c) (Vernon 1989).

Finally, we note Appellant's subsequent comments to Jane Williams, Billy Williams and Greg Bonner concerning the basis for the killing. To Jane and Billy Williams, he indicated that he drew his weapon not in fear or rage but because Branscrum was not taking his monetary demands seriously. Bonner was told that the deceased was killed because of a drug "rip-off". At no time did he suggest a fight or any threat toward himself, armed or unarmed. There was no error in refusing the requested instruction. Point of Error No. One is overruled.

■ Point of Error No. Two complains of the trial court's refusal to deliver a

requested limiting instruction concerning the jury's consideration of the extraneous cocaine offense. The trial court denied the request on the basis that this extraneous offense was res gestae of the indicted offense. This was a proper ruling by the trial judge. *Arivette v. State*, 513 S.W.2d 857 (Tex.Crim.App.1974). To this we add that the extraneous offense was relevant to the issue of motive for the indicted murder. This evidentiary relationship also forecloses the need for a limiting instruction. Appellant relies upon the opinion in *Hitchcock v. State*, 612 S.W.2d 930 (Tex. Crim.App.1981) which in turn relied upon the earlier opinion of *Johnson v. State*, 509 S.W.2d 639 (Tex.Crim.App.1974). In *Johnson*, the Court of Criminal Appeals held that a limiting instruction is required upon request when an extraneous offense is offered to circumstantially prove identity. The Court went on to state that no limiting instruction is required when an extraneous offense is offered to directly prove one of the main issues in the indicted case, such as motive, intent or malice. *Johnson*, 509 S.W.2d at 640, n. 3.

■ Appellant, while primarily challenging the refusal to deliver a limiting instruction, continues to complain of the inadmissibility of the extraneous cocaine offense. Neither complaint is meritorious. In prosecutions for murder, evidence of all relevant facts and circumstances surrounding the killing and the previous relationship existing between the deceased and the accused is admissible. Tex.Penal Code Ann. sec. 19.06 (Vernon 1989). See *Luck v. State*, 588 S.W.2d 371 (Tex.Crim.App.1979), cert denied, 446 U.S. 944, 100 S.Ct. 2171, 64 L.Ed.2d 799 (1980); *Albritton v. State*, 662 S.W.2d 377 (Tex.App.—Beaumont 1983, PDRR). Point of Error No. Two is overruled.

Point of Error No. Three complains of prosecutorial argument outside the record. The argument appears to be a reasonable reference to and paraphrasing of the cross-examination testimony of Jane Williams. *Alejandro v. State*, 493 S.W.2d 230 (Tex. Crim.App.1973). Point of Error No. Three is overruled.

■ Point of Error No. Four challenges the sufficiency of the evidence. The evidence reflected Appellant's ill will toward the deceased, the precise motivation for the murder, active efforts over a period of several days to locate Branscum and the fact that Appellant was armed during that period with a weapon consistent in calibre with the murder weapon. Branscum was alive when Appellant entered the cab of the truck. Branscum received two gunshot wounds—one below his left ear and the other to the left side of his back. The shots were fired from several inches away. Branscum's own weapon was found holstered on the floorboard near his feet. Branscum himself was still restrained by the lap and shoulder straps of his seat belt. Upon exiting the vehicle, Appellant immediately told Jane and Billy Williams that Branscum was dead. He then fled and destroyed his own pistol. His comments as to the circumstances of the shooting made to Jane and Billy Williams and Greg Bonner were inconsistent with voluntary manslaughter, suicide, a killing in self-defense or death at some third party's hands. The evidence, albeit circumstantial, admits of no other reasonable exculpatory hypothesis. *Brandley v. State*, 691 S.W.2d 699 (Tex.Crim.App.1985); *Wilson v. State*, 654 S.W.2d 465 (Tex.Crim.App.1983). Point of Error No. Four is overruled.

■ Point of Error No. Five challenges the sufficiency of the evidence to support the finding of the use of a deadly weapon, a firearm as alleged in the indictment. This point is unquestionably frivolous. Appellant concedes that the pathologist testified that a bullet caused the death "but did not testify what caused the bullet to enter the body...." There is no evidence that the bullets were hammered into Branscum's neck and back. As noted above, Appellant was armed with a pistol. Jane Williams saw a yellow flash in the cab of the truck. While hiding in Marathon, Appellant admitted pulling his gun on Branscum when the latter refused to take him seriously. He later melted his pistol and disposed of the remains. In talking to Greg Bonner, Appellant referred to the

"shooting" of Branscum and said "that he got shot." Point of Error No. Five is overruled.

■ In Point of Error No. Six, Appellant complains that he received ineffective assistance of counsel at trial under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Appellant complains that counsel did not object to evidence of threats allegedly made by Appellant toward Ricky Howard and Bryan Hamilton. No objection would have been properly sustained. These threats reflected Appellant's anger toward the individuals, including Branscum, who had used or taken his cocaine.

As indicated above, this constituted res gestae or contextual evidence of the indicted offense, as well as evidence of state of mind and motive.

■ Next, Appellant complains of the failure to object to evidence that Branscum had reported Appellant to Crime Stoppers. The appropriate objection—hearsay—has not even been raised by appellate counsel. The subject matter was relevant, reflected the prior relationship of the parties under Tex.Penal Code Ann. sec. 19.06 (Vernon 1989), and certainly could have contributed to homicidal motivation. Only the mode of proof was improper and that hearsay flaw has been waived on appeal as well as at trial.

■ Next, Appellant complains of the failure to object to prejudicial evidence of fright on the part of other witnesses. In fact, while depicting the fear of the witnesses (Howard, Hamilton and Daughenbaugh), with regard to the former two, the testimony was intended to reflect the Appellant's demeanor while in contact with them. The expressions of fear on the part of Daughenbaugh, described in hearsay fashion by her mother, were admissible as excited utterances. Tex.R.Crim.Evid. 803(2).

Appellant's eighth complaint concerns the prosecutor's final argument reference to threats against others who had participated in taking Appellant's cocaine. As previously stated, these threats were admissible as reflecting Appellant's continued state of anger and his progression towards a final confrontation with Branscum, all stemming from the same original cocaine incident. The argument was not improper.

The ninth complaint alleges argument outside the record, asserting that Appellant was expressing threats to various people who were in turn communicating them to others, ultimately reaching the ears of Branscum. This argument was not outside the record and does present a reasonable synopsis of the passage of these verbal threats, as reflected in the testimony of Howard, Hamilton and Daughenbaugh.

■ Without belaboring a discussion under the first prong of *Strickland*, we find that the remaining complaints raised under this point of error do present deficient performance by trial counsel. Bearing the numbers assigned by Appellant, they are summarized as follows:

7. Failure to object to State argument at the guilt stage that now the jurors should understand why police and prosecutors ask for certain verdicts in drug cases in order to avoid resulting tragedies like that in the present case;

10. After Jane Williams' direct examination denial of overhearing Appellant's discussion of the killing following news broadcasts observed in Marathon, counsel elicited on cross-examination that Appellant sought payment for the cocaine and only drew his weapon on Branscum because the latter was not taking him seriously;

11. At final argument on guilt, counsel responded to the State's depiction of Appellant hunting Branscum by stating that the evidence did not show that Appellant "or one of his bandito friends" was over there looking for Branscum, there being no evidence of Appellant's association with anyone depicted as a "bandito";

12. At final argument on punishment, counsel told the jury that their verdict would have no deterrent effect upon or change the life styles of any of the primary participants, including Appellant;

13. Continuing the cross-examination of Jane Williams by asking if, after the news broadcasts, Appellant was "bragging about having killed Kelly," thereby accepting a State-oriented interpretation of the circumstantial evidence and implications of Williams' testimony;

14. At final argument on punishment, counsel stated that in "almost all of the other murder cases [they had tried, they had] evidence for two or three days" and were ultimately accused by the State of using smoke screens, that they had tried to put the victim on trial, that counsel did not engage in that kind of defense, if the evidence is there he brings it out and (implicitly) if it is not he does not, thereby suggesting to the jury that there was no favorable evidence for Appellant since the defense put on no witnesses;

15. After the State, in final argument at guilt, accurately quoted Jane Williams' testimony that Appellant exited Branscum's truck and said, "He is dead," counsel in final argument misquotes Williams as stating that Appellant said "I killed him or I shot him, I [trial counsel] don't really remember which ...";

16. Counsel, at final guilt argument, summarizes the evidence in a State-oriented fashion as to the flight to Marathon, the burning of clothing and melting of the gun.

None of these incidents can be attributable to colorable tactical decision. Nor are they independent, isolated instances of professional lapse. Nor are they deficient from a purely retrospective vantage point. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–695.

■ Admittedly, our immediate impression was that these deficiencies would ne-

cessitate reversal. Upon closer analysis, however, we have concluded that in fact Appellant has not satisfied the second prong of the *Strickland* test under which he must show that the deficiencies in trial representation prejudiced his defense. Our concern is whether counsel's performance so undermined the adversarial process in this case as to render the result unreliable in terms of justice. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Translating that concern to somewhat less abstract terms under the second prong, is there a reasonable probability, sufficient to undermine confidence in the outcome of the trial, that but for the deficiencies in representation, a different result would have obtained. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. It is Appellant's burden to unsettle the appellate court's confidence in the propriety of the present judgment and sentence. In assessing this issue, we have given separate consideration to the verdicts on guilt and on punishment.

Complaints 7, 10, 11, 13, 14, 15 and 16 bear upon the guilt issues and verdict of the jury at the first stage of trial. To summarize Appellant's argument as to these errors, trial counsel enhanced the State's case through the phrasings used in examination of witnesses, through answers elicited from Jane Williams and by the tenor of his argument, virtually conceding that Appellant had in fact committed the shooting act leading to Branscum's death. On the guilt issues, trial counsel seemed to focus attention solely upon the intent element. Appellate counsel asserts harm on the basis that this excessive concession by trial counsel prejudiced Appellant in the face of a circumstantial evidence case presented by the State. True, the State's case did consist of circumstantial evidence, but it was a strong case despite the "contribution" of trial counsel for the defense. Eliminating the noted deficiencies would still have resulted in the same submission to the jury—murder or not guilty. These deficiencies did not cause the elimination of self-defense, voluntary manslaughter or any other lesser included offense. Appellant's presentation of these deficiencies has

not shaken, to any degree, our confidence that the jury would have reached the same guilty verdict even in the absence of these deficiencies.

■ The complaints cited immediately above could also, of course, have contributed to the State's punishment position. Of particular significance at the second stage, however, are complaints 7, 12 and 14. Appellant received a maximum sentence of life imprisonment and a fine of $10,000.00. Once again, the precise issue under the second prong of *Strickland* is whether the deficiencies in trial representation undermine our confidence in or the reliability of this sentence from a perspective of fair trial and just result. Is there a reasonable probability that but for the deficiencies, a different sentence would have been obtained? Such an analysis requires us to consider the sentence in light of the entire record—evidence, charge and arguments. Admittedly, Appellant did not kill a choir boy. The deficiencies in the victim's character are, however, by law not mitigating factors, unless put in issue. Additionally, in this case they are amply offset by Appellant's own connection with the cocaine that was at the origin of the conflict. The evidence did not raise self-defense or voluntary manslaughter—Branscum's pistol remaining holstered at his feet and Branscum himself still restrained by the lap and shoulder straps of his seat belt. The evidence did not reflect a fight in the sense of mutual combat. The evidence did reflect that despite ample time to cool off, Appellant actively sought out Branscum for several days and armed himself in the process. He threatened death and/or serious bodily injury to others. At the time of the shooting, Branscum was physically impaired by a .25 blood alcohol concentration. He was initially found by Appellant passed out in the cab of his truck. The autopsy reflects that Branscum, in this incapacitated condition and restrained by his seat belt, was physically assaulted (face, arm and hand) prior to the shooting. He was then shot in the back and below the left ear. The evidence, in sum, reflects the brutal execution of an extremely vulnerable victim.

■ We further note another factor which must be assayed in this analysis. Given the sentence and the foregoing distillation of the record, what frame of reference is to be utilized in determining whether or not the same verdict would or would not probably have been reached in the absence of trial counsel's lapses. Any time a jury's punishment verdict is to be evaluated for possible harm resulting from some trial error, whether the analysis be under *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim. App.1985) or *Rose v. State*, 752 S.W.2d 529 (Tex.Crim.App.1988) or some other standard, the appellate court must of necessity be relying upon its familiarity with whatever established patterns of jury verdicts have arisen in a given jurisdiction. While this factor is not expressly stated in any published opinion, it is implicit in the appellate function on these issues. Certainly, the appellate court may not rely simply upon its own notion of a just verdict, for to do so would violate the distinction between the functions of trial court fact-finder and appellate oversight. Appellate judges may not simply supplant the jury's decision with their own direct evaluation of the evidence.

We hesitate to describe this latter factor as one involving "judicial notice" but it certainly parallels that doctrine. We also do not mean to suggest that pattern jury verdicts are always so consistent as to afford precise comparisons with the case under review. Certainly, however, broad conclusions can be extracted if juries within certain geographical locales do reflect consistency and regularity in certain types of cases, and those broad conclusions and expectations may be sufficient to definitely answer the second prong of *Strickland*. By way of example, first-time residential burglars in Seminole, Texas, may readily expect imprisonment at the hands of a jury, while a similarly situated defendant in El Paso could consistently expect probation. We also do not mean to suggest that affirmance may be based upon even a well-established sentencing pattern on the part of a particular judge or the juries in a particular community if the pattern reflects a propensity to harshness which is unusual or idiosyncratic in relation to the normal range of responses in our society as a

whole. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. From the cases which have passed through this Court since acquisition of criminal jurisdiction in 1981, we conclude that Ector County petit juries have exhibited consistency and regularity in their punishment verdicts in murder cases which are devoid of mitigation and devoid of elements of self-defense or sudden passion. That pattern reflects the ready imposition of maximum sentences in cases similar to that presently before this Court. That pattern is also, in this Court's opinion, within the range of normal societal attitudes; it is not so unusual as to be characterized as idiosyncratic. We emphasize that Appellant bears the burden of persuasion under both prongs of *Strickland*, and he has failed in this case to establish a "but-for" relationship between the noted deficiencies in representation and the resulting sentence. Point of Error No. Six is overruled.

In Point of Error No. Seven, Appellant contends that the lower court erroneously denied a new trial when it was discovered that a State's witness had testified without administration of the witness oath. The majority of the witnesses were sworn en masse at the commencement of the evidentiary portion of the trial. One witness, Terry Cooper, arrived separately, was not sworn in with the group and when later called to the stand, was examined without oath. No objection was raised at the time. We find that the error was waived under *Beck v. State*, 719 S.W.2d 205 (Tex.Crim.App.1986). Actual knowledge of the failure to administer the oath is not a prerequisite to a finding of waiver by failure to object. Appellant's reliance on *Cauble v. Key*, 256 S.W. 654 (Tex.Civ.App. —Austin 1923, no writ) is misplaced. There, the Appellant and his attorney were not present in the courtroom to lodge an objection and could not be charged with waiver. Point of Error No. Seven is overruled.

The judgment is hereby affirmed.